UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LuANN DANGER, on behalf of herself and others similarly situated, | Civil Action No.: |
| Plaintiff, | **COMPLAINT - - CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| NEXTEP FUNDING, LLC and MONTEREY FINANCIAL SERVICES, LLC, | |
| Defendants. | |

**NATURE OF ACTION**

1.      This is a class action brought under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*., and its implementing regulation, 12 C.F.R. § 1026 ("Regulation Z"); the Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667 *et seq*., and its own implementing regulation, 12 C.F.R. § 1013 ("Regulation M"); as well as Minnesota law forbidding usurious contracts.

2.      As one district court recognized, "Congress enacted the CLA as an amendment to the TILA and [thereby] extended the TILA's 'credit disclosure requirements to consumer leases.'" *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 209 (D. Conn. 2001) (quoting *Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 454 (2d Cir. 1999)).

3.      The TILA—and, by extension, the CLA—was put in place to protect consumers from obfuscation or misinformation in credit and lease transactions.

1

4.    That is, Congress recognized and sought to remedy the information imbalance in such transactions, particularly for inexperienced or uninformed consumers lacking the financial acumen of those companies responsible for extending credit.

5.    This action is founded upon the failures of two such companies, Nextep Funding, LLC ("Nextep") and Monterey Financial Services, LLC ("Monterey") (together, "Defendants"), to provide adequate disclosures under the TILA and the CLA with regard to consumer credit sales disguised as leases for personal property.

6.    Defendants' use of lease agreements for consumer purchases is both strategic and sinister, as it would ostensibly allow them to avoid the stringent disclosure requirements of the TILA, including disclosure of interest rates applicable to consumers' purchases.

7.    In the case of LuAnn Danger ("Plaintiff"), that interest rate—undisclosed to her—topped 120% for the purchase of her pet dog, Bailey Rose.

8.    Such a rate far exceeds the limit under Minnesota law of 8% per annum allowed for personal debts like Plaintiff's.

9.    This case centers on Defendants' usurious contracts and deliberate obfuscation of important financial terms and disclosures in its dealings with Plaintiff and other consumers, in violation of federal and state law.

## PARTIES

10.    Plaintiff is a natural person who at all relevant times resided in Carlton County, Minnesota.

11.     Plaintiff leased personal property—a pet dog—pursuant to a Consumer Pet Lease Agreement ("Agreement")[1] and therefore is a "lessee" as defined by 15 U.S.C. § 1667(2).

12.     Nextep is a for-profit limited liability company with its principal office in Loudoun County, Virginia.

13.     Nextep "offers a retailer to customer closed end consumer lease platform designed to increase retailer sales by offering customers the ability to finance goods and services on the spot, in the store and without delay."[2]

14.     Nextep advertises on its website: "We take pride in our dynamic product by providing superior customer service and retailer training in anticipation of increased sales for our retail partners and appreciative customers who get to leave their store with what they came for."[3]

15.     Nextep also promises to "approve[] your customers with no credit or bad credit when other companies cannot, helping more of your customers leave with their purchases every day. Why miss out on a sale simply because a customer does not have enough money in their pocket? Signing up takes minutes and you can begin offering the program instantly!"[4]

---

[1]     A true and correct copy of Plaintiff's Agreement is attached as Exhibit A.

[2]     https://nextepfunding.com/ (last visited February 26, 2018).

[3]     https://nextepfunding.com/ (last visited February 26, 2018).

[4]     https://nextepfunding.com/Home/Retailers (last visited February 26, 2018).

16.    At all relevant times, Nextep, in the ordinary course of its business, regularly extended consumer credit payable by agreement in more than four installments or for which the payment of a finance charge is or may be required.

17.    Additionally, Nextep is one of the entities to whom the debt arising from the Agreement is initially payable.

18.    Nextep is thus a "creditor" within the meaning of the TILA. *See* 15 U.S.C. § 1602(g) and 12 C.F.R. § 1026.2(17).

19.    Further, at all relevant times, Nextep regularly engaged in leasing, offering to lease, or arranging to lease personal property under a consumer lease.

20.    Plaintiff's Agreement with Nextep identifies Nextep as the "Lessor." Ex. A.

21.    Nextep thus is also a "lessor" within the meaning of the CLA. *See* 15 U.S.C. § 1667(3) and 12 C.F.R. § 1013.2(h).

22.    Monterey is a for-profit limited liability company with corporate headquarters in San Diego County, California.

23.    Monterey offers a host of services related to loan servicing, debt recovery, and consumer finance.

24.    In particular, and most pertinent here:

Monterey has created consumer financing programs, which traditional lenders have failed to deliver. In addition to being a loan servicing specialist, Monterey has developed consumer financing programs that not only meet the needs of niche businesses and consumers spanning the credit spectrum, but its flexible alternative finance options have caught the attention of large volume and well known retailers and companies who

realize that traditional lenders neglect a significant portion of consumer market.[5]

25.    Monterey offers consumer financing programs to clients of all sizes in the United States, Canada, Mexico, and elsewhere.[6]

26.    Monterey boasts successful consumer financing programs in retail markets such as furniture stores, jewelry stores, and pet stores.[7]

27.    Monterey is identified in the Agreement as the payee for all monies Plaintiff owes under the Agreement.

28.    The Agreement directs Plaintiff to "send all payments to: *Monterey Financial 4095 Avenida De La Plata, Oceanside, CA 92056 . . . .*" Ex. A.

29.    Monterey is thus a "creditor" within the meaning of the TILA, *see* 15 U.S.C. § 1602(g) and 12 C.F.R. § 226.2(17), as it regularly extends consumer credit for which a finance charge is or may be imposed, or which, by written agreement, is payable in more than four installments.

30.    And Monterey is one of the entities to whom the transaction which is the subject of this action was initially payable.

---

[5]   http://www.montereyfinancial.com/finance/finance.html (last visited February 26, 2018).

[6]   http://www.montereyfinancial.com/finance/finance.html (last visited February 26, 2018).

[7]   http://www.montereyfinancial.com/finance/finance.html (last visited February 26, 2018).

## JURISDICTION AND VENUE

31.    This Court has jurisdiction under 15 U.S.C. § 1640(e), 15 U.S.C. § 1667d(c), and 28 U.S.C. § 1331.

32.    Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), where the acts and transactions giving rise to Plaintiff's action occurred in this district and where Defendants transact business in this district.

## FACTUAL ALLEGATIONS

### The TILA

33.    "The TILA reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'" *Layell v. Home Loan & Inv. Bank, F.S.B.*, 244 B.R. 345, 350 (E.D. Va. 1999) (quoting *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 377 (1973)).

34.    The statute thus "has been found uniformly to be remedial in nature and thereby liberally and broadly construed in favor of the consumer." *Travis v. Trust Co. Bank*, 621 F.2d 148, 151 (5th Cir. 1980).

35.    The TILA accordingly is strictly enforced, and absolute compliance is necessary. *In re Porter*, 961 F.2d 1066, 1078 (3d Cir. 1992) ("A creditor who fails to comply with TILA in any respect is liable to the consumer under the statute regardless of the nature of the violation or the creditor's intent."); *Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir. 1983) ("To insure that the consumer is protected, as Congress envisioned, requires that the provisions of the Act and the regulations implementing it be absolutely complied with and strictly enforced.").

36.    "[S]trict interpretation of the TILA has largely been responsible for the TILA's success in achieving widespread compliance with its requirements." *In re Brown*, 106 B.R. 852, 857 (Bankr. E.D. Pa. 1989).

37.    Indeed, without strict compliance, the TILA's goals of standardized uniform disclosures quickly would be eroded.

38.    Regulation Z requires creditors to make TILA disclosures "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 1026.17.

39.    The clarity of a creditor's disclosure is a question of law, determined under an "ordinary consumer" standard. *Palmer v. Champion Mortg.*, 465 F.3d 24, 28 (1st Cir. 2006).

40.    And because this standard is objective, what any given consumer knows or does not know is immaterial when evaluating a creditor's TILA disclosures.

## The CLA

41.    "Passed by Congress as an amendment to the Truth In Lending Act [], the CLA purports 'to assure a meaningful disclosure' of personal property lease terms to 'enable the lessee to compare more readily the various lease terms available to him [and] limit balloon payments in consumer leasing.'" *Gaydos v. Huntington Nat. Bank*, 941 F. Supp. 669, 672 (N.D. Ohio 1996) (quoting 15 U.S.C. § 1601(b)).

42.    The CLA's primary purpose is to

"assure a meaningful disclosure of the terms of leases . . . so as to enable the lessee to compare more readily the various lease terms available to him." 15 U.S.C. § 1601(b). Because lease financing had become recognized as an alternative to credit financing and installment sales contracts, Congress also intended CLA disclosure requirements to "enable

comparison of lease terms with credit terms where appropriate." *Id.* The CLA thus requires lessors of personal property subject to its provisions to make specified disclosures when a lease is entered into. *See* 15 U.S.C. § 1667a (consumer lease disclosures).

*Turner*, 180 F.3d at 454.

43.    Accordingly, the TILA's "strict liability standard attaches to violations of CLA disclosure requirements as well." *Gaydos*, 941 F. Supp. at 672.

### Plaintiff's Credit Transaction

44.    Plaintiff is a disabled American veteran whose only child left for her first year of college in August 2017.

45.    In anticipation of her daughter's departure, and to help fill the void that soon would be created, Plaintiff decided to search for a pet in June 2017.

46.    Plaintiff ultimately selected a Yorkshire terrier and Maltese mix who she named Bailey Rose.

47.    Bailey Rose cost $1,381.89 to purchase from Premier Pups.

48.    Plaintiff opted to finance the purchase through Defendants.

49.    So, Plaintiff entered into the Agreement with Nextep, which allowed her to take possession of Bailey Rose on June 16, 2017 in exchange for 24 monthly payments of $138.28, plus certain fees.

50.    Significantly, Nextep styled the Agreement as a "Consumer Pet Lease Agreement" and thus provided Plaintiff with a disclosure statement as required by the CLA. Ex. A.

51.    That statement discloses an "Amount Due at Lease Signing or Delivery" of $173.28; a "Total of your Monthly Payments" of $138.28; "Other Charges" of $103.64; and a "Total of Payments" of $3,318.73. *Id.*

52.    The "Other Charges" consist of a "Disposition Fee" of $103.64 if Plaintiff does not purchase her pet at the end of the lease. *Id.*

53.    The Agreement also provides for a "Purchase Option at End of Lease Term" of $207.28 "plus official fees and taxes related to the purchase." *Id.*

54.    The CLA and Regulation M require lessors like Nextep to disclose to consumers "[t]he number, amount, and due dates or periods of payments scheduled under the lease, and the total amount of the periodic payments" made in connection with any consumer lease transaction for personal property. 12 C.F.R. § 1013.4(c); *see also* 15 U.S.C. § 1667a.

55.    Nextep misidentified the total amount of the periodic payments as being only $138.28. *See* Ex. A ("The Total of your Monthly Payments is <u>$138.28</u>.") (emphasis in original).

56.    Of course, the Agreement actually requires 24 monthly payments of $138.28, which totals $3,318.72 by the conclusion of the lease. *Id.*

57.    Further, under the separate heading of "Total of Payments," which Nextep describes as "[t]he amount you will have paid by the end of the Lease," the Agreement lists $3,318.73. *Id.*

58.    But this, too, is inaccurate, as the Agreement requires payment of a $35 "Warranty Fee" at lease signing, plus a $103.64 "Disposition Fee" or purchase option fee

9

of at least $207.28 (not including possible "official fees and taxes related to the purchase") at the close of the lease. *Id.*

59.    Accordingly, the true "Total of Payments" by the end of the lease will be either $3,457.36 (if Plaintiff does not purchase Bailey Rose) or a minimum of $3,561.00 (if Plaintiff purchases Bailey Rose).

60.    What's more, though styled a "Consumer Pet Lease Agreement," the Agreement is, in reality, a deceptively disguised credit sale.

61.    As the Eighth Circuit recognized:

> The legislative history of the TILA shows that Congress was aware that "some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish," *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 365, 93 S. Ct. 1652, 1658, 36 L.Ed.2d 318 (1973), and that it intended to include within the statutory definition of "credit sales" purported leases "if they are, in essence, disguised sale arrangements." 1968 U.S. Code Cong. & Ad. News 1962, 1980.

*Clark v. Rent-it Corp.*, 685 F.2d 245, 248 (8th Cir. 1982).

62.    Per Regulation Z, a lease agreement is treated as a credit sale under the TILA when a consumer:

> (i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and
>
> (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

12 C.F.R. § 1026.2(a)(16).

63.    Under the Agreement here, Plaintiff will pay Defendants a sum reaching more than $3,400, which is well in excess of Bailey Rose's purchase price of $1,381.89.

64.     And after fulfilling her monthly lease obligations, Plaintiff may purchase Bailey Rose for a nominal one-time payment of only $103.64—approximately 3% of the total proceeds required under the Agreement.[8]

65.     Thus, the Agreement qualifies as a consumer credit sale subject to the mandatory disclosure provisions of the TILA and Regulation Z.

66.     The TILA requires disclosure of, *inter alia*, the "amount financed," a statement of the consumer's right to obtain a written itemization of the amount financed, the "finance charge" (expressed as an "annual percentage rate"), the sum of the amount financed and the finance charge, and the number, amount, and due dates or period of payments scheduled to repay the total of payments. 15 U.S.C. § 1638(a)(2)-(6).

67.     By styling their finance agreement with Plaintiff as a lease, Defendants obfuscated the exorbitant cost of the credit they extended to her.

68.     To be sure, the annual percentage rate for Plaintiff's Agreement, when calculated according to Appendix J of Regulation Z, is over 120%.

69.     At the time she signed the Agreement, Plaintiff was unaware of the true financing cost associated with her purchase of Bailey Rose.

70.     Plaintiff was surprised to later learn that the Agreement requires her to pay an effective interest rate of more than 120% on the purchase price of Bailey Rose.

---

[8]     While the Agreement lists a "Purchase Option" of $207.28, it otherwise requires a "Disposition Fee" of $103.64 if Plaintiff elects *not* to purchase Bailey Rose. So, at the conclusion of the lease term, Plaintiff must additionally pay a minimum of $103.64 regardless of whether she keeps Bailey Rose. Accordingly, the true "additional consideration" necessary to do so is only $103.64, not $207.28—either of which is "nominal" in comparison to the contract value. *See* 12 C.F.R. § 1026.2(a)(16).

71.     By not disclosing this very high finance charge, Defendants effectively hid from Plaintiff the true cost of the credit that they were extending her, and took from her the ability to shop intelligently for alternative financing.

72.     In fact, Nextep's website includes a section for "Frequently Asked Questions" in which it specifically addresses the topic of "What Is The Interest Rate?" associated with its financing products.

73.     Tellingly, Nextep avoids this question altogether by advising that "[l]eases are not the same as loans and do not have an interest rate. Please read the leasing agreement carefully to understand the monthly payments, length of term, residual value and total of payments."[9]

74.     But the transaction for Bailey Rose is a credit sale, not a closed-end lease.

75.     Unlike other consumer goods such as electronics, furniture, or automobiles, it is not common for individuals to "use" pets for a limited period of time—say, two years—under the expectation that those pets will eventually be returned to their sellers for use elsewhere.

76.     Rather, consumers obtain pets to develop life-long bonds, friendship, and companionship, which is what Plaintiff did here.

77.     Plaintiff purchased Bailey Rose to help fill the void created by the departure of her daughter for college.

---

[9]     https://nextepfunding.com/Home/Customers (last visited February 26, 2018).

78.    Most, if not all, consumers who spend two years integrating a pet into their family will undoubtedly elect to purchase that pet at the end of the lease agreement due to the relationship that human beings naturally develop with their pets.

79.    Defendants prey on this relationship to extract extraordinary finance charges—undisclosed to the consumer—by offering "leases" with (all but guaranteed) nominal purchase options in the place of traditional credit sales subject to greater scrutiny under the TILA.

80.    And the purchase option employed here no doubt qualifies as "nominal" in relation to the Agreement—regardless of its percentage of the whole—given the bond developed between the lessee (Plaintiff) and the leased property (Bailey Rose) during the term of the lease, which effectively precludes the return of the property at lease-end. *Accord In re Grubbs Const. Co.*, 319 B.R. 698, 715-18 (Bankr. M.D. Fla. 2005) (in differentiating lease agreements from security interests under the Uniform Commercial Code, "[t]he 'sensible person' test provides that 'where the terms of the lease and option to purchase are such the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest,'" while "[t]he Economic Realities Test focuses on all the facts and circumstances surrounding the transaction as anticipated by the parties at contract inception, rather than at the time the option arises") (collecting cases).

81.    Moreover, the finance charge applied to Plaintiff's purchase—over 120%— far exceeds the 8% limit imposed by Minnesota law for personal debts like hers. *See* § 334.01, Minn. Stat.

82.    Defendants must accordingly refund to Plaintiff any and all interest paid under the Agreement since the annual percentage rate contravenes Minnesota law. *See* § 334.02, Minn. Stat.

83.    The same is true for all other Minnesota consumers who unwittingly contracted to similar exorbitant interest rates.

84.    Worth noting, the Eighth Circuit Court of Appeals had occasion to apply Minnesota's usury laws in the context of class action litigation over rent-to-own contracts—just like Plaintiff's—and affirmed judgment in favor of the plaintiff class for agreements charging effective annual percentage rates between 46% and 746%. *Fogie v. THORN Ams., Inc.*, 95 F.3d 645 (8th Cir. 1996).

## CLASS ACTION ALLEGATIONS

85.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the following three classes:

### CLA Class

All persons throughout the United States (a) to whom Nextep Funding, LLC leased personal property for personal, family, or household purposes, (b) with an initial lease term greater than four months, (c) for which the lease is currently in force or was terminated on or after February 26, 2017, and (d) in connection with which Nextep Funding, LLC listed an incorrect sum for the total amount of the lessee's monthly payments.

### TILA Class

All persons throughout the United States (a) to whom Nextep Funding, LLC leased personal property for personal, family, or household purposes, (b) within the year preceding the filing of this complaint, (c) providing for payments to be made to Monterey Financial Services, LLC, and (d) in connection with which Nextep Funding, LLC or Monterey Financial Services, LLC (1) charged payments totaling in excess of the total value of

14

the property involved, (2) allowed the lessee to become the owner of the leased property upon compliance with the lease agreement for no additional consideration or for consideration totaling no more than 10% of the total of payments owed under the lease, and (3) failed to disclose the annual percentage rate charged on the transaction.

### Usury Class

All persons (a) with an address in Minnesota, (b) to whom Nextep Funding, LLC leased personal property for personal, family, or household purposes, (c) in connection with which Nextep Funding, LLC or Monterey Financial Services, LLC charged an effective annual percentage rate of greater than 8%, (d) within the two years preceding the filing of this complaint.

86.    Excluded from the classes are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which either defendant has or had controlling interests.

87.    The proposed classes satisfy Rule 23(a)(1) because, upon information and belief, they are so numerous that joinder of all members is impracticable. The exact number of class members is unknown to Plaintiff at this time and can only be determined through appropriate discovery.

88.    The members of the proposed classes are ascertainable because the classes are defined by reference to objective criteria.

89.    The proposed classes are identifiable in that, upon information and belief, the names and addresses of all members of the proposed classes can be identified in business records maintained by Defendants.

90.    The proposed classes satisfy Rules 23(a)(2) and (3) because Plaintiff's claims are typical of the claims of the members of the classes.

91.    To be sure, the claims of Plaintiff and all of the members of the classes originate from the same conduct, practice, and procedure on the part of Defendants, and Plaintiff possesses the same interests and has suffered the same injuries as each member of the proposed classes.

92.    Plaintiff satisfies Rule 23(a)(4) because she will fairly and adequately protect the interests of the members of the classes and has retained counsel experienced and competent in class action litigation.

93.    Plaintiff has no interests that are irrevocably contrary to or in conflict with the members of the classes that she seeks to represent.

94.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.

95.    Furthermore, as the damages suffered by individual members of the classes may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the classes to individually redress the wrongs done to them.

96.    There will be no difficulty in the management of this action as a class action.

97.    Issues of law and fact common to the members of the classes predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the classes.

98.    Among the issues of law and fact common to the classes are:

a) Defendants' violations of the CLA and the TILA, and their implementing regulations, as alleged herein;

b) Defendants' failure to properly provide disclosures required by the CLA and the TILA;

c) Defendants' violations § 334.01, Minn. Stat., as alleged herein;

d) the availability of statutory penalties;

e) the availability of interest reimbursement; and

f) the availability of attorneys' fees and costs.

**COUNT I: VIOLATIONS OF 15 U.S.C. § 1667a(9) AND 12 C.F.R. § 1013.4(c) AGAINST NEXTEP**

99.     Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 98.

100.    The CLA at 15 U.S.C. § 1667a(9) provides:

Each lessor shall give a lessee prior to the consummation of the lease a dated written statement on which the lessor and lessee are identified setting out accurately and in a clear and conspicuous manner the following information with respect to that lease, as applicable:

* * *

(9) The number, amount, and due dates or periods of payments under the lease and the total amount of such periodic payments;

101.    Regulation M at 12 C.F.R. § 1013.4(c) provides:

For any consumer lease subject to this part, the lessor shall disclose the following information, as applicable:

* * *

(c) Payment schedule and total amount of periodic payments. The number, amount, and due dates or periods of payments scheduled under the lease, and the total amount of the periodic payments.

102.    Nextep's Agreement lists total monthly payments of only $138.28, *see* Ex. A ("The Total of your Monthly Payments is <u>$138.28</u>."), when, in reality, Plaintiff owes 24 monthly payments of $138.28, for a total of $3,318.72.

103.    Nextep thus violated 15 U.S.C. § 1667a(9) and 12 C.F.R. § 1013.4(c) by providing a false disclosure of the total amount of monthly payments owed under the Agreement, prior to the consummation of Plaintiff's Agreement with Nextep.

104.    The harm suffered by Plaintiff is particularized in that the violative Agreement was presented to her personally, regarded her personal obligations in connection with the lease of a pet dog, and failed to give her statutorily-mandated disclosures to which she was entitled.

105.    Likewise, the CLA's disclosure provisions

serve[] to protect a consumer's concrete interest in "avoid[ing] the uninformed use of credit," a core object of the TILA. These procedures afford such protection by requiring a creditor to notify a consumer, at the time he opens a credit account, of how the consumer's own actions can affect his rights with respect to credit transactions. A consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him. For that reason, a creditor's alleged violation of each notice requirement, by itself, gives rise to a "risk of real harm" to the consumer's concrete interest in the informed use of credit.

*Strubel v. Comenity Bank*, 842 F.3d 181, 190-91 (2d Cir. 2016) (emphasis in original).

106.    No matter, that risk of real harm materialized here, as Plaintiff was unaware of the true financing cost associated with the purchase of her dog as a result of Nextep's inadequate disclosures.

## COUNT II: VIOLATIONS OF 15 U.S.C. § 1638
## AGAINST NEXTEP AND MONTEREY

107.    Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 98.

108.    The TILA at 15 U.S.C. § 1638 provides:

(a) **REQUIRED DISCLOSURES BY CREDITOR** For each consumer credit transaction other than under an open end credit plan, the creditor shall disclose each of the following items, to the extent applicable:

(1) The identity of the creditor required to make disclosure.

(2)

(A) The "amount financed", using that term, which shall be the amount of credit of which the consumer has actual use. This amount shall be computed as follows, but the computations need not be disclosed and shall not be disclosed with the disclosures conspicuously segregated in accordance with subsection (b)(1):

(i) take the principal amount of the loan or the cash price less downpayment and trade-in;

(ii) add any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title; and

(iii) subtract any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit.

(B) In conjunction with the disclosure of the amount financed, a creditor shall provide a statement of the consumer's right to obtain,

upon a written request, a written itemization of the amount financed. The statement shall include spaces for a "yes" and "no" indication to be initialed by the consumer to indicate whether the consumer wants a written itemization of the amount financed. Upon receiving an affirmative indication, the creditor shall provide, at the time other disclosures are required to be furnished, a written itemization of the amount financed. For the purposes of this subparagraph, "itemization of the amount financed" means a disclosure of the following items, to the extent applicable:

> (i) the amount that is or will be paid directly to the consumer;

> (ii) the amount that is or will be credited to the consumer's account to discharge obligations owed to the creditor;

> (iii) each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person; and

> (iv) the total amount of any charges described in the preceding subparagraph (A)(iii).

(3) The "finance charge", not itemized, using that term.

(4) The finance charge expressed as an "annual percentage rate", using that term. This shall not be required if the amount financed does not exceed $75 and the finance charge does not exceed $5, or if the amount financed exceeds $75 and the finance charge does not exceed $7.50.

(5) The sum of the amount financed and the finance charge, which shall be termed the "total of payments".

(6) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

(7) In a sale of property or services in which the seller is the creditor required to disclose pursuant to section 1631(b) of this title, the "total sale price", using that term, which shall be the total of the cash price of the property or services, additional charges, and the finance charge.

(8) Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate", "total of payments", and "total sale price" as specified by the Bureau. The descriptive explanation of "total sale price" shall include reference to the amount of the downpayment.

\* \* \*

(b) **FORM AND TIMING OF DISCLOSURES** . . .

(1) Except as otherwise provided in this part, the disclosures required under subsection (a) shall be made before the credit is extended. Except for the disclosures required by subsection (a)(1) of this section, all disclosures required under subsection (a) and any disclosure provided for in subsection (b), (c), or (d) of section 1605 of this title shall be conspicuously segregated from all other terms, data, or information provided in connection with a transaction, including any computations or itemization.

\* \* \*

109.    Further, Regulation Z at 12 C.F.R. § 1026.2(a)(16) declares:

(a) Definitions. For purposes of this part, the following definitions apply:

\* \* \*

(16) Credit sale means a sale in which the seller is a creditor. The term includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer:

(i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and

(ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

110.    As the Agreement requires compensation for Defendants well in excess of the total value of Plaintiff's pet dog, and considering that Plaintiff may purchase the dog at the end of the lease for an additional $207.28—or just 5% of the total contract value—the lease qualifies as a credit sale subject to the TILA's disclosure requirements.

111.    Defendants, by way of their Agreement, thus violated 15 U.S.C. § 1638 in several ways, including, for example, their failures to adequately disclose: the "finance

charge," not itemized, using that term (§ 1638(a)(3)); the finance charge expressed as an "annual percentage rate", using that term (§ 1638(a)(4)); or the sum of the amount financed and the finance charge, which shall be termed the "total of payments" (§ 1638(a)(5)).

112.    That is, Defendants hid from Plaintiff the exorbitant annual percentage rate applied to her purchase—over 120%.

113.    The harm suffered by Plaintiff is particularized in that the violative Agreement was presented to her personally, regarded her personal obligations in purchasing a pet dog, and failed to give her statutorily-mandated disclosures to which she was entitled.

114.    Further, the TILA's disclosure provisions

> serve[] to protect a consumer's concrete interest in "avoid[ing] the uninformed use of credit," a core object of the TILA. These procedures afford such protection by requiring a creditor to notify a consumer, at the time he opens a credit account, of how the consumer's own actions can affect his rights with respect to credit transactions. A consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him. For that reason, a creditor's alleged violation of each notice requirement, by itself, gives rise to a "risk of real harm" to the consumer's concrete interest in the informed use of credit.

*Strubel*, 842 F.3d at 190-91 (emphasis in original).

115.    No matter, that risk of real harm materialized here, as Plaintiff was unaware of the true financing cost associated with the purchase of her dog as a result of Defendants' inadequate disclosures.

116.     Had Plaintiff been made aware of the true cost of Defendants' credit, she might have pursued alternative financing options such as purchasing Bailey Rose with a credit card.

117.     Defendants' failure to disclose the excessive interest rate charged—over 120%—robbed her of the ability to intelligently compare financing options.

## COUNT III: VIOLATIONS OF § 334.01, MINN. STAT. AGAINST NEXTEP AND MONTEREY

118.     Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 98.

119.     Section 334.01, Minnesota Statutes, provides as follows:

**Subdivision 1. General.** The interest for any legal indebtedness shall be at the rate of $6 upon $100 for a year, unless a different rate is contracted for in writing. *No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater sum, or any greater value, for the loan or forbearance of money, goods, or things in action, than $8 on $100 for one year.* In the computation of interest upon any bond, note, or other instrument or agreement, interest shall not be compounded, but any contract to pay interest, not usurious, upon interest overdue, shall not be construed to be usury. Contracts shall bear the same rate of interest after they become due as before, and any provision in any contract, note, or instrument providing for an increase of the rate of interest after maturity, or any increase therein after making and delivery, shall work a forfeiture of the entire interest; but this provision shall not apply to notes or contracts which bear no interest before maturity nor shall it apply to any agreement which extends the maturity date of any contract, note, or instrument, and provides for an increased rate of interest after the original maturity date on the indebtedness then due. Any agreement which extends maturity date of any contract, note or instrument shall not provide for an increased rate of interest in excess of $8 on $100 for one year.

(emphasis added).

120.     Section 334.02, Minnesota Statutes, provides:

23

*Every person who for any such loan or forbearance shall have paid or delivered any greater sum or value than in section 334.01 allowed to be received may, personally or through personal representatives, recover in an action against the person who shall have received the same, or the receiver's personal representatives, the full amount of interest or premium so paid, with costs, if action is brought within two years after such payment or delivery.* This section does not apply when the loan or forbearance is made by a lender and the lender is subject to section 47.59 or 48.196 or chapter 56 in connection with the loan or forbearance. For purposes of this section, the term "lender" means a bank or savings bank organized under the laws of this state, a federally chartered savings association or savings bank, a savings association organized under chapter 51A, a federally chartered credit union, a credit union organized under chapter 52, an industrial loan and thrift company organized under chapter 53, a licensed lender under chapter 56, or a mortgagee or lender approved or certified by the secretary of housing and urban development or approved or certified by the administrator of veterans affairs.

(emphasis added).

121. The Agreement extended Plaintiff financing for the purchase price of her pet dog ($1,381.89) in exchange for her commitment to two years' worth of monthly payments, plus certain upfront and closing fees.

122. Taking into account all periodic payments and required fees, Plaintiff will have paid Defendants a minimum of $3,561.00 by the end of the Agreement to keep Bailey Rose indefinitely.

123. Thus, the total of payments required of Plaintiff to purchase Bailey Rose amounts to an effective annual percentage rate in excess of 120%.

124. This annual percentage rate far exceeds the limit of 8% allowed by Minnesota law for personal debt like Plaintiff's.

125. Accordingly, Defendants must refund to Plaintiff the full amount of interest she has paid in connection with the Agreement, per § 334.02, Minn. Stat.

126.    What's more, Defendants intended to evade Minnesota usury law and the TILA and CLA by styling its Agreement as a lease contract, rather than consumer credit sale, to avoid the restrictions and disclosure requirements mandated by Minnesota and federal law.

**WHEREFORE**, Plaintiff respectfully requests relief and judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Adjudging and declaring that Nextep violated 15 U.S.C. § 1667a(9) and 12 C.F.R. § 1013.4(c) for its failure to provide adequate disclosures;

C. Adjudging and declaring that Defendants violated 15 U.S.C. § 1638 for their failure to provide adequate disclosures;

D. Adjudging and declaring that Defendants violated § 334.01, Minn. Stat., for their imposition of interest at a rate greater than 8%;

E. Awarding Plaintiff and members of the classes actual damages pursuant to 15 U.S.C. § 1667d(a) and 15 U.S.C. § 1640(a)(1), and/or statutory damages pursuant to 15 U.S.C. § 1667d(a) and 15 U.S.C. § 1640(a)(2)(B);

F. Awarding Plaintiff and members of the Usury Class reimbursement of all interest paid to Defendants, pursuant to § 334.02, Minn. Stat.;

G. Enjoining Defendants from future violations of 15 U.S.C. § 1667a(9), 12 C.F.R. § 1013.4(c), 15 U.S.C. § 1638, and § 334.01, Minn. Stat., with respect to Plaintiff and the classes;

H. Enjoining Defendants from future violations of § 334.01, Minn. Stat.;

I.  Awarding Plaintiff and members of the classes their reasonable costs and attorneys' fees incurred in this action, including expert fees, pursuant to 15 U.S.C. § 1640(a)(3) and Rule 23 of the Federal Rules of Civil Procedure;

J.  Awarding Plaintiff and the members of the class any pre-judgment and post-judgment interest as may be allowed under the law; and

K.  Awarding other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

Plaintiff is entitled to and hereby demands a trial by jury.

DATED:  February 26, 2018                    Respectfully submitted,


                                             /s/ Mark L. Vavreck
                                             Mark L. Vavreck
                                             Gonko & Vavreck, PLLC
                                             Attorneys at Law
                                             Designer's Guild Building
                                             401 North Third Street, Suite 600
                                             Minneapolis, Minnesota 55401
                                             Tel: (612) 659-9500
                                             Fax: (612) 659-9220
                                             mvavreck@cgmvlaw.com

                                             Jesse S. Johnson*
                                             Greenwald Davidson Radbil PLLC
                                             5550 Glades Road, Suite 500
                                             Boca Raton, Florida 33431
                                             Tel: (561) 826-5477
                                             Fax: (561) 961-5684
                                             jjohnson@gdrlawfirm.com

                                             *Counsel for Plaintiff and the proposed classes*

                                             *To seek admission *pro hac vice*