# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| LuAnn Danger,<br><br>   Plaintiff,<br><br>v.<br><br>Nextep Funding, LLC and Monterey<br>Financial Services, LLC,<br><br>   Defendants. | Case No. 18-cv-567 (SRN/LIB)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Jesse S. Johnson, Greenwald Davidson Radbil PLLC, 5550 Glades Road, Suite 500, Boca Raton, Florida 33431; Mark L. Vavreck, Gonko & Vavreck, PLLC, 401 North Third Street, Suite 600, Minneapolis, Minnesota 55401, for Plaintiff.

Steven L. Baron, George V. Desh, & Bruce N. Menkes, Mandell Menkes LLC, 1 North Franklin Street, Suite 3600, Chicago, Illinois 60606; Scott S. Payzant, Paul Shapiro, & Eldon J. Spencer, Jr., Leonard, O'Brien, Spencer, Gale & Sayre, Ltd., 100 South Fifth Street, Suite 2500, Minneapolis, Minnesota 55402, for Nextep Funding, LLC.

Patrick D. Newman, Bassford Remele, 100 South Fifth Street, Suite 1500, Minneapolis, Minnesota 55402; Richard M. Scherer, Jr., Lippes Mathias Wexler Friedman LLP, 50 Fountain Plaza, Suite 1700, Buffalo, New York 14202, for Monterey Financial Services, LLC.

SUSAN RICHARD NELSON, United States District Judge

  This matter comes before the Court on the Motions to Dismiss filed by Defendants

Nextep Funding, LLC ("Nextep") [Doc. No. 46] and Monterey Financial Services, LLC

("Monterey") [Doc. Nos. 22 & 39]. For the reasons stated below, Defendants' motions are

denied.

# I.   BACKGROUND

## A.  Factual Background

In June 2017, Plaintiff LuAnn Danger purchased a Yorkshire Terrier and Maltese mix puppy from Premier Pups.  (Am. Compl. [Doc. No. 35] ¶¶ 46–47.)  Premier Pups offered the dog for sale at a price of $1,381.89.  (*Id.* ¶ 47.)

Danger financed the purchase through Defendants.  (*Id.* ¶ 48.)  Defendant Nextep is a for-profit company that "offers a retailer to customer closed end consumer lease platform designed to increase retailer sales by offering customers the ability to finance goods and services on the spot, in the store and without delay." (*Id.* ¶ 13.)  Defendant Monterey is a for-profit company that "offers a host of services related to loan servicing, debt recovery, and consumer finance" in order to "meet the needs of niche businesses and consumers . . . ." (*Id.* ¶ 23.)

On June 16, 2017, Danger entered into an agreement (the "Agreement") with Nextep, which allowed her to take possession of the dog in exchange for 24 monthly payments of $138.28, plus fees.  (*Id.* ¶ 49.)  The parties dispute whether the Agreement is a consumer lease or credit sales agreement.

The second page of the nine-page Agreement bears Nextep's logo, and is styled as a "Consumer Pet Lease Agreement."  (Agmt. at 2,[1] Ex. A to Am. Compl.) It contains a provision labeled "**Important Information Concerning Your Lease**," and appears as follows:

---

[1] Citations are to the page numbers in the document itself, not the CM/ECF page numbers that appear in the banner of the filed exhibit.

# Important Information Concerning Your Lease

By signing the following documents, you are entering into a Closed End Consumer Product  Lease.

You understand that this Agreement is a **lease,** not a loan and that you are leasing the product(s).

You understand that **you do not own the product(s) you are leasing unless:**

1) You buy the product through the early buyout option (for more information see Section 8 of this Agreement or visit your account at nextepfunding.com); or

2) You pay $207.28 after your final lease payment.

Your lease can be paid off at any time. Call us anytime to get your payoff amount.

The total value of the product(s), capitalized cost, you are leasing is $1381.89.

To satisfy your lease obligation you must make one in-store payment of $173.28 and 23 lease payments of $138.28.

If you decide to purchase the product(s) at the end of your lease, you must pay a purchase price of $207.28 plus any applicable fees or taxes.

The total amount you will have paid by the end of this lease, at full term, is $3318.73.

You must make each monthly payment by the due date or you may be subject to additional fees.

(*Id.*) (emphasis in original).

The next page of the Agreement contains the provision that is most pertinent here, outlined in a box enumerated as Section 2, bearing the heading "Federal Consumer Leasing Act Disclosures." (*Id.*, § 2.)  It appears as follows:

| 2. FEDERAL CONSUMER LEASING ACT DISCLOSURES | | | |
|---|---|---|---|
| **Amount Due at Lease Signing or Delivery**<br><br>Capitalized cost reduction $0.00<br>First monthly payment $138.28 Administrative Fee $0.00<br>Warranty Fee $35.00<br>— — — — — — — — $ _<br><br>Total $173.28 | **Monthly Payments** Your first monthly payment of $138.28 is due on 06/16/ 2017, followed by 23 monthly payments of $138.28 due on the 20th of each month. The Total of your Monthly Payments is $138.28. | **Other Charges** (not part of your monthly payment)<br><br>*Disposition Fee $103.64<br>$ _<br>$ _<br><br>Total $103.64<br><br>* Payable if you do not purchase the Pet . | **Total of Payments**<br><br>(The amount you will have paid by the end of the Lease)<br><br><br><br>$3318.73 |
| **Purchase Option at End of Lease Term** . You have an option to purchase the Pet at the end of the Lease term for $207.28, plus official fees and taxes related to the purchase.<br>**Other Important Terms.** See your Lease documents for additional information on early termination , purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interest, if applicable . | | | |

(*Id.*)

The first column of Section 2, labeled "**Amount Due at Lease Signing or Delivery**," lists a $35 "Warranty Fee," due at signing. (*Id.*) (emphasis in original). In the third column, under "**Other Charges** (not part of your monthly payment)," the Agreement identifies a "Disposition Fee" of $103.64 if Danger ultimately decides not to purchase the dog. (*Id.*) (emphasis in original). At the bottom of the Section 2 box is a provision labeled "**Purchase Option at End of Lease Term**," which applies if Danger decides to keep the dog. (*Id.*) (emphasis in original). If she decides to do so, the purchase option is $207.28, "plus official fees and taxes related to the purchase." (*Id.*)

In the second column of Section 2, under the sub-heading "**Monthly Payments**," the Agreement provides for 24 payments of $138.28, due on the 20th of each month, and states

that "[t]he Total of your Monthly Payments is $<u>138.28</u>." (*Id.*) (emphasis in original). Two columns to the right, the Agreement also states: "**Total of Payments** (The amount you will have paid by the end of the Lease)[:] $<u>3318.73</u>." (*Id.*) (emphasis in original).

Monterey is identified in the Agreement as the payee for all of the debt arising from the Agreement. (Am. Compl. ¶ 27.) Specifically, the Agreement states that payments are to be mailed to "Monterey Financial, 4095 Avenida De La Plata, Oceanside, CA 92056." (Agmt. § 9, Ex. A to Am. Compl.) Likewise, all written communications concerning disputed amounts must be sent to Monterey Financial, at the same address. (*Id.*)

Danger has made her required monthly payments since entering into the Agreement, but will not complete her payments until June 16, 2019. (Am. Compl. ¶¶ 50, 51.)

**B. Procedural History**

In February 2018, Danger filed this suit, asserting claims under: (1) the Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667 *et seq.*, and its implementing regulation, 12 C.F.R. § 1013 ("Regulation M"); (2) the Truth in Lending Act, ("TILA"), 15 U.S.C. § 1601 *et seq.*, and its implementing regulation, 12 C.F.R. § 1026 ("Regulation Z"); and (3) Minnesota law prohibiting usurious contracts, Minn. Stat. § 334.01. She asserts her CLA claim against Nextep, (Am. Compl., Count I), alleging that prior to the consummation of the Agreement, Nextep falsely disclosed the total amount of periodic payments owed under the Agreement. (*Id.* ¶ 114.) Her TILA claim, asserted against both Defendants, alleges that they failed to adequately disclose: (1) the finance charge; (2) the finance charge expressed as an annual percentage rate ("APR"); and (3) the sum of the amount financed and the finance charge, i.e., the "total of payments." (*Id.*, Count II.) Danger asserts that Defendants concealed "the

exorbitant annual percentage rate" of 120% that applied to her purchase.  (*Id.* ¶¶ 125–26.)

Finally, Plaintiff asserts claims of usury arising under Minnesota state law against both

Defendants.  (*Id.*, Count III.)  She contends that the 120% APR to purchase the dog far

exceeds the usury statute's 8% limit for personal debt.  (*Id.* ¶¶ 141–42.)

As to her injuries, Plaintiff alleges that Nextep "took from her the ability to shop

intelligently for alternative financing."  (*Id.* ¶ 73.) She asserts that had she known the true

effective interest rate in the Agreement, she would have "pursued other financing options

such as using a credit card or obtaining a personal loan through her credit union."  (*Id.* ¶ 74.)

She contends that these alternative financing options would have carried a lower interest rate.

(*Id.* ¶ 75.)

Both Defendants move to dismiss Plaintiff's claims.  Citing Federal Rule of Civil

Procedure 12(b)(1), they argue that Danger lacks standing to assert her federal claims,

requiring the dismissal of Counts I and II for lack of subject matter jurisdiction, (Nextep's

Mem. at 5–14 [Doc. No. 48]; Monterey's Mem. at 2–7 [Doc. No. 41]), including claims

for which she seeks injunctive relief for future harms.  (Nextep's Mem. at 15–17.)

Defendants further argue that because the Court lacks subject matter jurisdiction over

Counts I and II, it should dismiss the pendent state law usury claim for lack of supplemental

jurisdiction.  (*Id.* at 14; Monterey's Mem. at 14 n.3.)

Even if the Court finds that Plaintiff has sufficiently alleged Article III standing,

Defendants move to dismiss her claims pursuant to Federal Rule of Civil Procedure

12(b)(6).  Nextep argues pursuant to Rule 12(b)(6), that Count I should be dismissed

because Danger has not plausibly alleged that Nextep failed to comply with the CLA.  (*Id.*

at 18–22.)  Monterey argues that Count II fails under Rule 12(b)(6), because loan servicers like Monterey are not subject to the TILA provisions in question.[2] (Monterey's Mem. at 10–13.)

Finally, both Defendants argue that under Rule 12(b)(6), Plaintiff's usury claim fails to plausibly allege a violation of Minnesota law.  (Nextep's Mem. at 22–25; Monterey's Mem. at 13–16.)  They assert that the Agreement should be considered an installment sale, which is not subject to Minnesota's usury laws.  (Nextep's Mem. at 22–25; Monterey's Mem. at 14–16.)

## III.     DISCUSSION

### A.     Rule 12(b)(1) Motion:  Standing

#### 1.  Standard of Review

The doctrine of standing limits the court's jurisdiction to "those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To successfully plead standing under Article III of the Constitution, a plaintiff must allege facts demonstrating the existence of an actual case or controversy by showing (1) a concrete injury-in-fact, (2) that is fairly traceable to the challenged action, and (3) that is likely to be redressed by the relief sought. *Id.* at 560–61.  "[S]tanding is to be determined as of the commencement of the suit," *id.* at 570 n.5, and the burden of establishing standing is on the party invoking federal jurisdiction.  *See Devine v. Stone, Leyton & Gershman, P.C.*, 100 F.3d 78, 82 (8th Cir. 1996).  Where, as here, the defendant

---

[2] Nextep does not move to dismiss Count II pursuant to Rule 12(b)(6).  Rather, its basis for seeking the dismissal of Count II is Plaintiff's alleged lack of standing, noted above.

challenges the existence of jurisdiction on the face of the pleadings, and not through extrinsic evidence, the reviewing court must "accept as true all factual allegations in the complaint, giving no effect to conclusory allegations of law." *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2012).

## 2. Standing for Monetary Relief

Defendants argue that Plaintiff fails to allege a sufficiently concrete injury-in-fact. (Nextep's Mem. at 11, 13; Monterey's Mem. at 6–8.) First, they contend that Danger has not alleged that she read the disclosures in question, much less that she was confused by them. (Nextep's Mem. at 11; Monterey's Mem. at 7.) Rather, Monterey infers that Plaintiff would have entered into the Agreement, regardless of the disclosures, in order to fill the void in her life created by her daughter's departure for college. (Monterey's Mem. at 7) (citing Am. Compl. ¶ 81). Second, they argue that Plaintiff has not plausibly alleged that she would have obtained another financing option, had she pursued it, (Nextep's Mem. at 12), nor has she alleged that she actually considered other financing options. (Monterey's Mem. at 7.) In particular, Nextep claims that Plaintiff also fails to identify the credit card she would have used and the interest rate on that credit card, or the kind of loans provided by her credit union. (Nextep's Mem. at 11.) Finally, Nextep asserts, even if disclosures were provided in an incorrect form, the information was, in fact, provided to Danger. (Nextep's Mem. at 14) (citing *Vera v. Mondelez Glob. LLC*, No. 16 C 8192, 2017 WL 1036509 (N.D. Ill. Mar. 17, 2017)).

Defendants rely on *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), in which the Supreme Court held that to establish an injury-in-fact under a different consumer statute—

the Fair Credit Reporting Act ("FCRA")—"a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  In *Spokeo*, the Supreme Court explained that a plaintiff does not automatically satisfy the injury-in-fact requirement simply because a statute creates a right and the authority to bring suit to vindicate that right. *Id.* at 1549.  Rather, a "bare procedural violation, divorced from any concrete harm" or material risk of harm does not satisfy the requirements for Article III standing.  *Id.*; *see also Braitberg v. Charter Comm'cns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016) (applying *Spokeo* and finding no standing where plaintiff alleged that cable provider retained plaintiff's personally identifiable information in violation of the Cable Communications Policy Act)).

However, the Supreme Court did not categorically find that violations of procedural statutory requirements were insufficient to confer Article III standing.  Rather, it acknowledged, that in some instances, "the violation of a procedural right granted by statute can be sufficient . . . to constitute injury in fact," *Spokeo*, 136 S. Ct. at 1549.  The Court identified cases in which it found such injuries were sufficiently concrete due to the defendants' failure to follow statutory disclosure requirements.  *Id.* at 1549–50 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998) (involving voters' inability to access information that Congress had made public); *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989) (regarding the inability of two advocacy groups to obtain information subject to disclosure under the Federal Advisory Committee Act).

As noted, the statute in question in *Spokeo* arose under the FCRA, which is not at issue here.  Rather, the claims here arise under the TILA and its implementing regulations.

Congress passed the TILA as a consumer protection act aimed at "assur[ing] a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). Given this remedial purpose, the Eighth Circuit has also observed that "[c]ourts broadly construe the TILA in favor of consumers." *Keiran v. Home Capital, Inc.*, 858 F.3d 1127, 1130 (8th Cir. 2017) (citing *Rand Corp. v. Yer Song Moua*, 559 F.3d 842, 845 (8th Cir. 2009)).

The Eighth Circuit and District of Minnesota have not analyzed *Spokeo* in the context of the CLA or TILA. Pre-*Spokeo*, some courts held that procedural violations under the TILA and CLA met the injury-in-fact requirements for standing. *See, e.g.*, *Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir. 1983) (finding that a procedural violation of the TILA—the use of the term "total time balance" instead of "total of payments"—created a sufficient injury-in-fact to support standing); *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 209 (D. Conn. 2001) (finding that because the CLA was enacted as an amendment to the TILA, the TILA's credit disclosure requirements extend to the CLA, and certain language in finance company's vehicle lease failed to meet both form and substance of the law).

Following the issuance of *Spokeo*, courts have applied the ruling to TILA claims, with differing results, driven by differing facts. Some have found the alleged harms or risk of harms sufficient to constitute an injury-in-fact, distinguishing them from the "no-harm procedural violations" detailed in *Spokeo*. For instance, in *Strubel v. Comenity Bank*, 842

F.3d 181, 190–91 (2d Cir. 2016), the court considered four alleged TILA disclosure violations, finding that the plaintiff had sufficiently alleged a concrete injury-in-fact for two of them. The TILA disclosures in question required notice that (1) certain consumer rights apply only to disputed credit card purchases not paid in full; and (2) consumers were required to give the creditor written notice with respect to unsatisfactory purchases. *Id.* at 190. In finding a sufficient injury-in-fact, the court explained that these disclosure requirements "protect a consumer's concrete interest in 'avoid[ing] the uninformed use of credit,' a core object of the TILA." *Id.* (quoting 15 U.S.C. § 1601(a)) (alteration in original). Observing that the required disclosures implicate the effect of a consumer's own actions with respect to credit transactions, the court stated,

> A consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him. For that reason, a creditor's alleged violation of each notice requirement, by itself, gives rise to a "risk of real harm" to the consumer's concrete interest in the informed use of credit.

(*Id.* at 190–91) (citing *Spokeo*, 136 S. Ct. at 1549); *see also McLaughlin v. Wells Fargo Bank, NA*, No. C 15-02904 WHA, 2016 WL 3418337, at *5–6 (N.D. Cal. June 22, 2016) (finding standing sufficiently alleged where defendant's inaccurate payoff statement directly affected the ability of the plaintiff-homeowner to pursue other options for avoiding foreclosure such as refinancing her mortgage or conducting a short sale).

Yet based on different facts, courts have also found that allegations of bare procedural TILA violations fail to satisfy *Spokeo*'s injury-in-fact requirements. For example, the two disclosure allegations for which the plaintiff lacked standing in *Strubel* required some form of action on the plaintiff's part, which Strubel had not alleged. 842 F.3d at 191–94. One

required the disclosure of a consumer's obligations with respect to stopping automatic payment of disputed charges, but Strubel's creditor and credit plan did not offer an automatic payment plan. *Id.* at 191–92. The other concerned the disclosure of the defendant's 30-day response obligations to report billing errors, but Strubel conceded that she had no reason to report a billing error. *Id.* at 192–93. The court found it notable that the plaintiff "[did] not assert that the allegedly flawed notice caused her credit behavior to be different from what it would have been had the credit agreement tracked the [proper language]." *Id.* at 193. Other courts have reached similar conclusions concerning allegations that fail to state how the plaintiff's behavior or credit would have been affected if the defendant had properly disclosed the information. *See Cottle v. Monitech, Inc.*, No. 7:17-CV-137-BO, 2017 WL 6519024, at *1, 8 (E.D.N.C. Dec. 20, 2017) (concluding that allegations of mere confusion are insufficient to support standing where plaintiff did not allege "that she would have evaluated the terms of her lease differently, made a different choice had she been presented with additional information, or in any way behaved other than she did," absent defendant's alleged CLA violation), *aff'd*, 733 F. App'x 136 (4th Cir. 2018); *Schwartz v. HSBC Bank USA*, N.A., No. 14 Civ. 9525 (KPF), 2017 WL 95118, at *6 (S.D.N.Y. Jan. 9, 2017) (finding no concrete injury where plaintiff conclusorily alleged that the bank's omissions merely "impinged on [his] awareness of the cost of credit"); *Kelen v. Nordstrom, Inc.*, 259 F. Supp. 3d 75, 81 (S.D.N.Y. 2016) (stating that the complaint "does not claim that [plaintiff] changed her behavior in any way based on [defendant's] allegedly insufficient disclosures"); *Jamison v. Bank of Am., N.A.*, 194 F. Supp. 3d 1022, 1028 (E.D. Cal. 2016) (holding that allegations failed to confer standing

for TILA claim where plaintiff did not allege that consequences of defendant's alleged conduct ever arose).

Defendants also rely on a case from the Northern District of Illinois in which Nextep is the defendant, *Prayitno v. Nextep Funding, LLC*, (Nextep's Mem. at 9–10; Monterey's Mem. at 5–6), although subsequent case history supports Danger's position. Like the cases noted in the preceding paragraph, the court in *Prayitno* initially found that the plaintiff had not properly alleged an injury-in-fact for his TILA claim because he had "not alleged how the alleged failure to provide the information (like APR) changed his behavior." (Nextep's Ex. 1 [Doc. No. 49] (*Prayitno v. Nextep Funding, LLC*, Case No. 17-cv-04310 (N.D. Ill. June 27, 2018 at 4)).)

However, the dismissal in *Prayitno* was without prejudice, (*id.*), and the plaintiff subsequently filed a third amended complaint. (Pl.'s Supp'l Auth., Ex. A [Doc. No. 59-1] (*Prayitno v. Nextep Funding, LLC*, Case No. 17-cv-04310 (Third. Am. Compl.).)) Again, Nextep moved to dismiss the TILA claim in the amended pleading, but the court denied the motion.[3] (Pl.'s Supp'l Auth., Ex. B [Doc. No. 59-2] (Notification of Docket Entry, Aug. 14, 2018).) The amended pleading in *Prayitno* contained allegations regarding how the plaintiff would have changed his behavior, similar to Danger's pleading here. *Compare* Pl.'s Supp'l Auth., Ex. A (*Prayitno v. Nextep Funding, LLC*, Case No. 17-cv-04310 (Third. Am. Compl. ¶ 28)) ("Had plaintiff understood that he would have to pay over 140% [APR], he would have done one or more of the following: (a) purchased the used transmission

---

[3] The denial of the renewed motion to dismiss in *Prayitno* occurred after the filing of Defendants' motions, memoranda, and reply briefs in this action.

job, at the lesser price, and paid cash, thereby avoiding the oppressive rate offered by defendant; [or] (b) sought out a small loan from a loan company.") *with Danger* Am. Compl. ¶¶ 73–74 ("By not disclosing this very high finance charge [of 120%], Defendants effectively hid from [Danger] the true cost of the credit that they were extending her, and took from her the ability to shop intelligently for alternative financing. Had [Danger] known the effective interest rate [was] so high, she would have pursued other financing options such as using a credit card or obtaining a personal loan through her credit union.").

Assuming that *Spokeo*'s standing requirements apply to claims under the TILA, the Court finds that the allegations here satisfy the requirement of a concrete injury-in-fact. Danger does not state that she *might* have considered getting alternative funding had she been aware of the interest rate. Instead she alleges that she *would have* pursued alternative funding, had Defendants disclosed the actual interest rate.[4] (Am. Compl. ¶¶ 71–75.) Granted, to *prove* her injury, Plaintiff will likely need to provide evidence about what credit

---

[4] Nextep argues that Plaintiff could not have received alternative funding because she came to Nextep for financing, suggesting that she had no other recourse. (Nextep's Reply at 10 [Doc. No. 57].) The Court finds this argument unpersuasive. A person eligible for alternative financing elsewhere could nevertheless still decide to finance a purchase with Nextep.

The Court also rejects Monterey's argument that there is no injury-in-fact because "Plaintiff does not allege that had the disclosures been made she would have decided to not lease the dog." (Monterey's Mem. at 7.) Monterey asserts that in light of Plaintiff's allegation that she got the dog to fill the void created by her college-bound daughter's absence, one can infer that Plaintiff "would have entered into the Lease Agreement regardless of what disclosures were or were not made." (*Id.*) The Court's focus here, however, is on the actual language of the pleadings and Danger makes no such allegation. (*See* Am. Compl. ¶¶ 71–75.) Monterey may pursue its inference in discovery, but it does not support dismissal of the Amended Complaint.

card she would have used, the rate on that credit card, or what kind of loans are provided by her credit union. But at the motion to dismiss stage, Plaintiff merely needs to *plausibly allege* that she had access to a credit card or credit union loan that had a lower interest rate than the one provided for in the Agreement. [5]

Defendants argue that Plaintiff fails to allege that she even read the disclosures in the Agreement, or that she was confused by them. (Nextep's Mem. at 11; Monterey's Mem. at 7–8.) Viewing Plaintiff's amended pleading as a whole, however, the Court finds that she has sufficiently alleged a concrete injury-in-fact. Whether Danger read the disclosures or was confused by them are factual issues that may be developed through discovery.[6]

Danger has alleged that Defendants failed to adequately convey the total amount

---

[5] In response to a question from the Court at the hearing on the instant motions, counsel for Nextep acknowledged that a re-pleaded allegation that "had Plaintiff known of the 120% APR, she would have pursued alternative financing," would "go a long way" toward pleading actual injury. The Court sees little difference between this hypothetical allegation and the allegations in the Amended Complaint, in which Danger alleges that the effective APR for the purchase of the dog was over 120%, (Am. Compl. ¶¶ 70–75), and "[h]ad Plaintiff known the effective interest rate [was] so high, she would have pursued other financing options such as using a credit card or obtaining a personal loan through her local credit union." (*Id.* ¶ 74); (*see also id.* ¶ 119) ("had [she] known of the true cost, she would have pursued less expensive alternatives such as a personal loan through her credit union or use of a credit card.").

[6] Granted, in *Kelen*, 259 F. Supp. 3d at 80, the court noted that the plaintiff failed to allege that she had ever read the challenged disclosures. However, that fact alone was not determinative of standing. Rather, the court based its dismissal of the plaintiff's TILA claim on multiple facts—primarily, the plaintiff's failure to allege that she changed her behavior based on Nordstrom's allegedly insufficient disclosures and her failure to allege that Nordstrom ever charged her a late payment fee or a returned payment fee, or an improperly calculated one. *Id.* As noted above, Plaintiff here has sufficiently alleged that she would have changed her course of action had she known the true APR, and that she

she owed under the Agreement, the total finance charge she was required to pay, and the finance charge expressed as an APR. (Am. Compl. ¶¶ 104–113, 122–126.) These allegedly inadequate disclosures created a risk of real harm to a concrete interest that both the TILA and the CLA were enacted to protect—the informed use of credit. And, in this case, Danger has plausibly alleged that "real harm" materialized, as she continues to pay an interest rate of more than 120% for her dog. Further, Plaintiff alleges that she chose not to shop for credit or obtain alternative financing at a better rate because of Defendants' allegedly inadequate disclosures. (*Id.* ¶ 75.) For all of these reasons, the Court finds that Plaintiff has properly alleged standing to seek monetary relief for her claims under the TILA and CLA.

### 3.   Standing for Injunctive Relief

In the Amended Complaint, Plaintiff requests injunctive relief, seeking to enjoin Defendants from allegedly continuing to violate the CLA, TILA, and Minnesota usury law. (*Id.* ¶ G at 28.) Nextep contends that Plaintiff lacks standing for injunctive relief because she has not properly alleged that she is likely to lease a pet or an item of personal property from Nextep in the near future, and because general allegations that Nextep "regularly extended consumer credit" or "regularly engaged in leasing" are insufficient to establish recurring harm. (Nextep's Mem. at 15–17.)

Although a plaintiff may have standing to request one form of relief, that "does not mean that she has standing for all forms of relief." *Disability Support All. v. Billman*, No.

---

continues to make payments under that rate. (Am. Compl. ¶ 75.)

CV 15-3649 (JRT/SER), 2016 WL 755620, at *13 (D. Minn. Feb. 25, 2016). Rather, to meet the injury-in-fact requirement, "a plaintiff seeking prospective relief against future conduct of defendants who caused injury in the past must show that she faces 'a real and immediate threat that she would again suffer similar injury in the future.'" *Mosby v. Ligon*, 418 F.3d 927, 933 (8th Cir. 2005) (quoting *Park v. Forest Serv.*, 205 F.3d 1034, 1037 (8th Cir. 2000)).

Here, Danger does not simply complain of "past interactions" with Nextep. Rather, she asserts that she "faces a real and immediate threat that she would again suffer similar injury in the future." (Pl.'s Mem. at 12 n.12.) She alleges that her injury is ongoing because she still owes Defendants the remaining balance of payments on the dog. (Am. Compl. ¶¶ 120, 133.) Her allegations of an ongoing injury are sufficient to establish standing for injunctive relief.

Nextep cites *Gardner v. Montgomery County Teachers Federal Credit Union*, 864 F. Supp. 2d 410, 421 (D. Md. 2012), in which the court found that the plaintiffs lacked standing to seek injunctive relief for their TILA claims. The court noted that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy," and "Plaintiffs have offered no facts at all suggesting that Defendant is poised to withdraw more money from their accounts or from the accounts of any putative class member. Indeed, Plaintiffs acknowledge that Defendant has suspended the DLT Program pending the outcome of this litigation. Plaintiffs therefore lack standing to seek an injunction." *Id.* In contrast, here, Danger has alleged that she continues to make payments pursuant to the terms of the Agreement, (Am. Compl. ¶¶ 120, 133), and Defendants have not suspended her payment obligations pending

the outcome of this litigation.  Accordingly, Plaintiff has sufficiently alleged standing to seek injunctive relief for future harms.

For all of the foregoing reasons, Defendants' motions to dismiss based on a lack of standing are denied.  Because the Court finds that Danger has sufficiently alleged standing as to her claims in Counts I and II, the Court need not consider the portion of Defendants' motions to dismiss the state law usury claim for lack of supplemental jurisdiction. (*See* Nextep's Mem. at 14; Monterey's Mem. at 14 n.3.)  Those portions of Defendants' motions are therefore denied.

### B.  Rule 12(b)(6): Failure to State a Claim

### 1.  Standard of Review

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff.  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).  However, the Court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Garden*s, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that plaintiffs draw from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). A complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may, however, "consider some materials that are part of the public record or do not contradict the complaint as well as materials that are necessarily embraced by the pleadings." *Id.* (quotations and citation omitted); *see also Illig v. Union Elec. Co*., 652 F.3d 971, 976 (8th Cir. 2011) ("In addressing a motion to dismiss, the court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." (quotation omitted) ). "[D]ocuments 'necessarily embraced by the complaint' are not matters outside the pleading," *Enervations, Inc. v. Minn. Mining & Mfg. Co*., 380 F.3d 1066, 1069 (8th Cir. 2004), and courts have discretion "to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." *Stahl v. United States Dep't of Agric*., 327 F.3d 697, 701 (8th Cir. 2003) (quotation omitted).

### 2. CLA Claim Against Nextep (Count I)

Nextep moves to dismiss Plaintiff's CLA claim, arguing that Danger fails to state a claim. (Nextep's Mem. at 18–22.) Nextep contends that information regarding the total amount of Plaintiff's payments was either correctly stated in the Agreement, stated elsewhere in the Agreement, or, even if not correctly stated, perfect compliance with the TILA is not

required.  (*Id.*)

The CLA is an amendment to the TILA that "extend[s] the TILA's 'credit disclosure requirements to consumer leases.'" *Clement*, 145 F. Supp. 2d at 209 (quoting *Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 454 (2d Cir. 1999)).  It regulates consumer leases made for personal, family, or household purposes that exceed four months in duration, for amounts not exceeding $50,000.  15 U.S.C. § 1667(1).  The CLA requires the disclosure of certain lease costs and terms, including the "number, amount, and due dates or periods of payments under the lease and the total amount of such periodic payments," *id.*, § 1667a(9), and provides for a private cause of action and the recovery of actual and statutory damages for violations of the disclosure requirements.  *Id.* §§ 1640, 1667d(a).

In the Amended Complaint, Plaintiff alleges that Nextep violated the CLA by "providing a false disclosure of the total amount of periodic payments owed under the Agreement." (Am. Compl. ¶ 114.)  She alleges that rather than disclosing the total amount of periodic payments due, the Agreement states, under "Monthly Payments" in Section 2, that "[t]he Total of your Monthly Payments is $138.28," when, in fact, 24 monthly payments of $138.28 result in a total of $3,318.73.  (*Id.*  ¶¶ 107–08) (citing Agmt. ¶ 2, Ex. A to Am. Compl.)  Also, Danger alleges that the disclosure in Section 2 regarding "[t]he amount you will have paid by the end of the Lease" is inaccurate because it omits the $35 Warranty Fee, and either a $103.64 Disposition Fee or a $207.28 Purchase Option Fee. (Am. Compl. ¶¶ 59–60.)

In its motion to dismiss, Nextep argues that the disclosure regarding "[t]he Total of your Monthly Payments" is actually correct, as each monthly payment was $138.28.

(Nextep's Mem. at 18.)  It notes that the phrase "Total of your Monthly Payments" is not defined in the CLA, Regulation M, or the commentary to Regulation M.  (*Id.* at 18 n.5.) Moreover, when viewing the disclosures in the Agreement as a whole, Nextep asserts that there is no ambiguity. Nextep points to language under "Total of Payments," in the fourth column of Section 2, that lists $3,318.73 as "[t]he amount you will have paid by the end of the Lease." (*Id.*)   Moreover, Nextep contends that even if the "Total of your Monthly Payments" was confusing, it is not plausible that Plaintiff thought the total price of her dog totaled $138.28, given that two columns to the right, the Agreement states that the "Total of Payments" is $3,318,73. (*Id.*)

As to the failure to include the warranty fee and disposition or purchase fee in the "Total of Payments," Nextep argues that nothing in the CLA or Regulation M requires those fees to be disclosed.  (*Id.* at 19.)  In fact, Nextep notes that Danger's claims only rely on the portions of the CLA and Regulation M that require the disclosure of the total amount of periodic payments: 15 U.S.C. § 1667a(9) and 12 C.F.R. § 1013.4(c).  (*Id.*) (citing Am. Compl. ¶¶ 104–06.)  But even if such information were required, Nextep asserts, it provided it elsewhere in Section 2.  (*Id.* at 20.)

Finally, Nextep also argues that even if any of the Agreement's disclosures were technically improper, perfect compliance with the TILA is not required.  (*Id.*)  It relies on a line of authority, primarily from other circuits.  (*Id.*[7])  It also cites a decision of the Eighth

---

[7] *Citing, e.g., Strubel*, 842 F.3d at 199 (finding that defendant's disclosure was "substantially similar" to the model form for disclosures under 15 U.S.C. § 1637(a)(7) and did not violate the TILA); *Watkins v. SunTrust Mortg., Inc.*, 663 F.3d 232, 239 (4th Cir. 2011) (finding that perfect disclosure is not required under the TILA, but clear and

Circuit Bankruptcy Appellate Panel, *In re Groat*, 369 B.R. 413, 417 (B.A.P. 8th Cir. 2007), in which the court found that a typographical error in one of the lender's notices concerning rescission was not misleading, and therefore, did not constitute a TILA violation. In addition, Nextep relies on two decisions from other district judges in this District, in which strict conformity with the TILA was not required, and the clear and conspicuous notice standard was found to be met. (Nextep's Mem. at 21–22) (citing *Gewecke v. U.S. Bank, N.A.*, No. 09-cv-1890 (JRT/RLE), 2010 WL 3717273, at *6–18 (D. Minn. 2010); *Peterson–Price v. U.S. Bank Nat'l Ass'n*, No. 09-cv-495 (ADM/JSM), 2010 WL 1782188, at *5–6 (D. Minn., May 4, 2010)).

The question of "whether disclosures under the TILA are inaccurate, misleading, or confusing is usually a question of fact for the factfinder. *Clement*, 145 F. Supp. 2d at 209. Here, the Court finds that Plaintiff has plausibly alleged a violation of the CLA against Nextep. Section 2 of the Agreement contains information that a consumer might view as conflicting and confusing, as it states that "[t]he Total of your monthly payments is $138.20" and the "Total of Payments" is $3318.73. (Agmt. § 2, Ex. A to Am. Compl.) Given the language of the Agreement, the Court cannot say, as a matter of law, that the disclosures in question meet the clear and conspicuous standard advanced by Nextep. *See Trombley v. SunTrust Mortg., Inc.*, No. 10-cv-3089 (JRT/JJG), 2012 WL 3029645, at * 5

_____

conspicuous provisions concerning the consequences of rescission is sufficient). *But see Handy v. Anchor Mortg. Corp.*, 464 F.3d 760, 764 (7th Cir. 2006) (strictly construing requirements regarding notice of right to rescind and finding that defendant's simultaneous provision of two forms did not clearly and conspicuously disclose the effect of rescission).

(D. Minn. July 24, 2012) (finding, on summary judgment, a question of fact as to whether the disclosure of conflicting APR information violated the TILA). Nextep's motion to dismiss Danger's CLA claim, pursuant to Rule 12(b)(6), is therefore denied.

### 3. TILA Claim Against Monterey[8] (Count II)

Although the Agreement is styled as a lease, Danger contends that it is a credit sale, subject to the TILA's disclosure requirements. (Am. Compl. ¶ 124; Pl.'s Opp'n to Monterey at 27 [Doc. No. 53].) In Count II of the Amended Complaint, she invokes a provision of the TILA that generally requires creditors to clearly and conspicuously disclose the finance charge of a consumer credit transaction, expressed as an APR, and the sum of the amount financed and the finance charge, to be labeled the "total of payments." (Am. Compl. ¶ 122) (citing 15 U.S.C. § 1638(a)(4)-(5)). She asserts that Defendants failed to disclose that the APR for the purchase of her dog was 120%. (*Id.* ¶ 126.)

In its motion to dismiss, Monterey asserts that this claim fails. It argues that Monterey is a mere "servicer," not subject to liability as a "creditor" under Section 1638. (Monterey's Mem. at 10–13.)

The TILA provides consumers with a private right of action against a creditor or any assignee of the creditor. *See* 15 U.S.C. § 1641(a). It defines "creditor" as "only . . . a person who both (1) regularly extends . . . consumer credit . . . , and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable . . . ." *Id.* § 1602(g). In contrast, a "servicer" is defined elsewhere by statute as the person responsible for "receiving

---

[8] While Plaintiff brings this claim against both Defendants, only Monterey moves to dismiss it pursuant to Rule 12(b)(6).

any scheduled periodic payments from a borrower pursuant to the terms of [the] loan . . . ." 12 U.S.C.§ 2605(i)(3) (addressing the servicing of mortgages). It is generally true that the TILA "does not allow a private cause of action against servicers." *Kelly v. Fairon & Assocs.*, 842 F. Supp. 2d 1157, 1162 (D. Minn. 2012).[9] *But see Stephenson v. Chase Home Fin., LLC,* No. 10cv2639–L(WMc), 2011 WL 2006117, at *3 (S.D. Cal. May 23, 2011) (denying motion to dismiss TILA claim against servicer where servicer failed to comply with TILA requirement, 15 U.S.C. § 1641(f)(2), that servicer provide the obligor with the name, address, and telephone number of the owner of the obligation or master servicer of the obligation); *Sam v. Am. Home Mortg. Servicing,* No. S–09–2177, 2010 WL 761228, at *3 (E.D. Cal. Mar. 3, 2010) (same). However, the TILA permits a servicer to be treated as an assignee of the consumer obligation if the servicer is or was the owner of the obligation. *See* 15 U.S.C. § 1641(f)(3).

In the Agreement, Monterey is mentioned in one provision:

You agree to make the monthly payments in the amount and at the time specified in Section 2. You may payoff [sic] your Lease at any time. You agree to make any other payments you owe under this Lease within 10 days of our invoice. Unless you enroll in the direct withdrawal program, you must send all payments to: Monterey Financial 4095 Avenida De La Plata, Oceanside, CA 92056 (or such other address as we may designate from time to time).

---

[9] Citing *Sherrell v. Bank of Am., N.A.,* No. CV F 11-1785, 2011 WL 6749765, at *11–12 (E.D. Cal. Dec. 22, 2011); *Holcomb v. Fed. Home Loan Mortg. Corp.,* No. 10-81186-CV, 2011 WL 5080324, at *6 (S.D. Fla. Oct. 26, 2011); *Consumer Solutions REO, LLC v. Hillery*, No. C-08-04357, 2010 WL 144988, at *3 (N.D. Cal. Jan. 8, 2010); *Garcia v. Fannie Mae,* 794 F. Supp. 2d 1155, 1172 (D. Or. 2011); *Selby v. Bank of Am., Inc.,* No. 09cv2079, 2011 WL 902182, at *6 (S.D. Cal. Mar. 14, 2011); *Ording v. BAC Home Loans Servicing, LP,* No. 10–10670, 2011 WL 99016, at *3 (D. Mass. Jan. 10, 2011).

(Agmt. § 9, Ex. A to Am. Compl.)  Pointing to this language, Monterey infers that because it did not receive Danger's initial payment, it was "merely designated as the loan servicer, as it was responsible for receiving the periodic (monthly) payments."  (Monterey's Mem. at 12.)

Further, Monterey claims that its role as a servicer is confirmed in a June 20, 2017 letter to Plaintiff, which it submits in support of its motion, attached to the Declaration of Shaun Lucas, Monterey's Executive Vice President [Doc. No. 42].   In the introductory paragraph, the letter states that Nextep "has appointed Monterey [ ] to service your lease contract." (Lucas Decl., Ex. A [Doc. No. 42–1] (June 20, 2017 Letter).)  Finally, Monterey argues that Danger fails to adequately allege that Monterey was, or is, the owner of the loan. (Monterey Mem. at 12.)

As previously noted, on a motion to dismiss under Rule 12(b)(6), the Court must generally ignore materials outside the pleadings.  *Porous Media,* 186 F.3d at 1079.  Here, the Court does not find the June 20, 2017 letter from Monterey to Danger to be a document embraced by the pleadings.  It is not a document "whose contents are alleged in a complaint and whose authenticity no party questions."  *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).  Therefore, the Court declines to consider it for purposes of the instant motions.

The Court finds that Danger has sufficiently alleged a TILA claim against Monterey. First, she alleges that the Agreement is a consumer credit sale, subject to the requirements of TILA and its implementing regulation.  (Am. Compl. ¶ 67.)  While Defendants dispute this

allegation, the Court cannot resolve factual disputes in their favor, but must view Plaintiff's allegations as true. *Hager*, 735 F.3d at 1013.

Further, Danger specifically alleges that Monterey is a creditor, (Am. Compl. ¶ 29), offering a "host of services," and positing itself as a non-traditional lender. (*Id.* ¶¶ 23, 24.) She points to language on Monterey's website that states:

> *In addition to being a loan servicing specialist*, Monterey has developed consumer financing programs that not only meet the needs of niche businesses and consumers spanning the credit spectrum, but its *flexible alternative finance options* have caught the attention of large volume and well known retailers and companies who realize that traditional lenders neglect a significant portion of [the] consumer market.

(*Id.* ¶ 24) (emphasis added). And, Danger reiterates that the Agreement identifies Monterey as the payee for Plaintiff's payments owed. (*Id.* ¶¶ 27, 28.)

Accordingly, the Court denies Monterey's motions to dismiss. Its status as a creditor or servicer of the transaction at issue here will be informed by discovery.

### 4. Usury Claim Against Both Defendants (Count III)

Defendants move to dismiss Plaintiff's usury claim, arguing that the transaction with Danger is not usurious. (Nextep's Mem. at 22–25; Monterey's Mem. at 14–16.) Rather, they argue that the Agreement is either a lease or an installment contract, and pursuant to the time-price doctrine, it falls outside the usury statute's scope. (*Id.*)

Usury is the "'taking or receiving of more interest or profit on a loan than the law allows.'" *In re Donnay*, 184 B.R. 767, 778 (Bankr. D. Minn. 1995) (quoting *Rathbun v. W.T. Gran Co.*, 219 N.W.2d 641, 646 (Minn. 1974)). As applicable here, Minnesota law forbids creditors from charging interest rates greater than 8%. Minn. Stat. § 334.01. If a

creditor imposes interest beyond this threshold, the borrower may bring an action within two years to recover all interest paid pursuant to the illegal arrangement. Minn. Stat. § 334.02.

The Minnesota Supreme Court has recognized the following four elements of a usury claim: (1) a loan of money or forbearance of debt; (2) an agreement between the parties that the principal shall be repayable absolutely; (3) the exaction of a greater amount of interest than is allowed by law; and (4) the presence of an intention to evade the law at the inception of the transaction. *Miller v. Colortyme, Inc.*, 518 N.W.2d 544, 549 (Minn. 1994).

Regardless of how the transaction is framed by the parties—for example, whether it be called a lease, loan, or sale—the applicability of the usury statute depends upon the nature of the transaction. *Id.* at 546 (stating that courts "look through the form to the substance of a transaction."). For instance, in *Colortyme*, the Minnesota Supreme Court examined the "leasing" of various consumer goods such as furniture, televisions, and appliances to consumers in rent-to-own agreements. *Id.* Under the contracts, customers rented the items for a weekly or monthly term and ultimately received ownership of the rented items for no additional consideration. *Id.* However, in order to obtain ownership, customers typically were required to pay a total price far in excess of fair market value. *Id.* The court found that these transactions were consumer credit sales, explaining that:

> [c]onsumers who purchase goods through rent-to-own agreements may not incur debt, but they still implicitly pay interest in return for the ability to pay for goods over time. Moreover, rent-to-own customers may not have an absolute obligation to repay a principal amount, but their situation is analogous to that of ordinary buyers on credit in that they must either forfeit

possession of a good or continue paying for it.

*Id.* at 549.  Because the court found that rent-to-own contracts were consumer credit sales for all practical purposes, such agreements were found to be "subject to the same consumer protection laws as ordinary credit sales, including the general usury statute, Minn. Stat. § 334.01." *Id.*  at 546.

However, pursuant to the time-price doctrine, some agreements fall outside the bounds of usury law.  *St. Paul Bank for Coops. v. Ohman*, 402 N.W.2d 235, 238 (Minn. Ct. App. 1987).  This doctrine may be applicable where, among other things, the seller offers a lower cash price and a higher credit price for the same goods.  *See Rathbun,* 219 N.W.2d at 647.  As the Minnesota Supreme Court has explained:

> The increase of the credit price for the purposes of the conditional sales contract does not convert what otherwise would be a sale into a loan.  The owner has the right to determine the price at which he will sell his property. He may fix one price for cash and another price for credit. The fact that the credit price exceeds the cash price by a greater percentage than is permitted by the usury law does not make the transaction usurious for the very plain reason that the transaction is a sale and not a loan.

*Id.* (quoting *Dunn v. Midland Loan Fin. Corp.*, 289 N.W. 411, 413 (Minn. 1939)).  Such transactions fall outside the scope of the usury statute because they represent "merely a sale of goods and not a loan of money, and there is no forbearance or loan because the debt is based on a future price and not on an amount then due." *St. Paul Bank*, 402 N.W.2d at 238.  However, in *Fogie v. THORN Ams., Inc.*, 95 F.3d 645, 653 (8th Cir. 1996), the Eighth Circuit addressed rent-to-own contracts similar to those in *Colortyme*, and found that the defendant's time-price argument was foreclosed by the rulings of the Minnesota Supreme Court (citing *Fogie v. Rent-A-Center, Inc.*, 518 N.W.2d 544 (Minn. 1994); *Colortyme*, 518

N.W.2d at 549; *Rathbun*, 219 N.W.2d at 647).

Nextep argues that the transaction here fails to meet the first two elements necessary for a claim of usury: it is neither a loan of money, nor an agreement between the parties that the principal shall be paid absolutely, noting that if the dog is lost, stolen, or dies, Danger is not required to fulfill the terms of the lease. (Nextep's Mem. at 22-23.) In *Colortyme*, however, the Minnesota Supreme Court held that because the Legislature had defined rent-to-own transactions in the Minnesota Consumer Credit Sales Act as "consumer credit sales" for all purposes, it established that such consumers are entitled to the protection of the state's usury law "even though rent-to-own consumers do not actually incur any debt and do not have any obligation to repay a principal amount." 518 N.W.2d at 549. Thus, the court found that the first two usury elements were met by operation of the usury statute.[10] *Id.* at 546.

Defendants also argue that the transaction here was not a rent-to-own agreement, but is instead subject to the time-price doctrine. (Monterey's Mem. at 15–16.) Nextep contends that Danger "ignores the defining aspect" of the rent-to-own contracts that were the subject of *Colortyme*: that the defendants did not offer their products for sale to the public at a cash price. (Nextep's Mem. at 24-25) (citing *Colortyme*, 518 N.W.2d at 548 n.4). Defendants assert that here, the dog was, in fact, offered for sale at a cash price, which

---

[10] In addition, the court found that the third element for a usury claim—exacting a greater amount of interest than is allowed by law—was satisfied, given that the difference between the total payments required under the contract and the value of the goods and services exceeded the statutory limit for interest. *Colortyme*, 518 N.W.2d at 550. The court also found that the fourth element, intent, was satisfied because the defendant intended to collect all of the money stated in the contract. *Id.*

is different than the total price that Danger will eventually pay. (*Id.*; Monterey's Mem. at 15–16.)

The Court disagrees with the characterization of this as the "defining aspect" of the rent-to-own contracts in *Colortyme*, as the court merely addressed it in a footnote. 518 N.W.2d at 548 n.4. But more importantly, in that footnote, the court simply noted that the time-price doctrine "*may* apply where a seller fixes one price for cash and another price for credit," but those facts were not before the court in *Colortyme*. *Id.* (emphasis added).

The facts here are less clear, as Premier Pups is the seller, not Defendants. In other words, this is not a case of a *seller* fixing one price for cash and one price for credit. The Court finds that Danger has adequately pleaded her usury claim. She alleges that Defendants have violated Minn. Stat. § 334.01 by charging an APR in excess of 120%, which exceeds the 8% limit allowed under Minnesota law for a personal debt. (Am. Compl. ¶¶ 135–45.) She further contends that Defendants intended to evade the operation of the statute by styling the Agreement as a lease contract, rather than a consumer credit sale. (*Id.* ¶ 145.) The Court acknowledges that the facts here do not align perfectly with the diverging authority on which Plaintiff and Defendants rely. However, the Minnesota Supreme Court has expressed an unwillingness to expand the time-doctrine unless justified by economic needs and social attitudes. *Rathbun*, 219 N.W.2d at 648. The Court finds that the viability of Plaintiff's usury claim will be better informed by discovery. At this stage, Defendants' motions to dismiss are denied.

**III.     Conclusion**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Nextep's Motion to Dismiss [Doc. No. 46] is **DENIED**; and

2. Defendant Monterey's Motions to Dismiss [Doc. Nos. 22 & 39] are **DENIED**; and

3. The Stay entered in this matter [Doc. No. 81] is hereby **LIFTED**.


Dated: January 23, 2019                                   s/Susan Richard Nelson
                                                                         SUSAN RICHARD NELSON
                                                                         United States District Judge